# IN THE UNITED STATES DISTRICT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESSIE POPPE, individually, and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMAND |
| FISHER-PRICE, INC. and MATTEL, INC. | |
| Defendants. | |

As and for this Class Action Complaint, Plaintiff Jessie Poppe, individually and on behalf of all others similarly situated, alleges the following against Defendants Fisher-Price, Inc. ("Fisher-Price") and Mattel, Inc. ("Mattel") (collectively, "Defendants"), based on personal knowledge as to Plaintiff, and Plaintiff's own acts and as to all other matters, based upon, *inter alia*, the statements of Defendants, publicly disseminated news reports, and the investigation conducted by and through Plaintiff's undersigned counsel:

## SUMMARY OF CASE

1. From 2009 to present, Fisher-Price sold over $4.7 million Rock 'n Play Sleepers ("Sleepers" or "Rock 'n Play") at $50 to $80[1] equaling gross revenues of between $235 and $376 million.

---

[1] See <u>Washington Post</u> article dated May 30, 2019 entitled "How Fisher--Price invented a popular day sleeper without safety tests and kept selling it even as babies died" online at https://www.washingtonpost.com/business/economy/how-fisher-price-invented-a-popular-baby-sleeper-without-safety-tests-and-kept-it-on-the-market-even-as-babies-ied/2019/05/30/78c2707a-7731-11e9-b3f5-5673edf2d127_story.html?utm_term=.4adf32c3bc5a

2.      The revenues resulted from an invention developed by a small group of engineers at the Fisher–Price toy company located outside of Buffalo, New York. This invention addressed a basic gap in the market, a product that helped parents get their infant children to sleep. The box the Sleepers came in stated "Baby can sleep at a comfortable incline all night long!" [2]

3.      On April 12, 2019, the Rock 'n Play was recalled by Fisher-Price after a series of infant deaths (the "Recall"). The Consumer Product Safety Commission ("CPSC"), which helped coordinate the Recall, stated that more than 30 babies died in the product after they turned over while unrestrained or "under other circumstances." On April 8, 2019 Consumer Reports' published an article documenting the concerns about the product's development and pushed for the recall after it obtained agency records concerning the deaths.

4.       Fisher-Price continued to sell and aggressively market the Sleepers even while it was aware of fatalities of infants who sleep in the Sleepers and while the American Academy of Pediatrics ("AAP") and consumer groups repeatedly warned of the dangers of the Sleepers. In fact, of the 32 fatalities more than half occurred after September 2016.[3] It was not until April 2019 that Defendants acknowledged at least 32 infant deaths attributed to the Sleeper since 2009.

5.      In the face of the above, Fisher-Price's owner, Mattel, declined to respond to a detailed list of questions about the Rock 'n Play and its creation and instead stuck its head in the sand and stated that "Safety is priority number 1 for Fisher-Price" and the company "has a long, proud tradition of prioritizing safety as our mission."

---

[2] Id.

[3] Voight, H. "Infant Deaths Prompt Questions Over Safety of Inclined Sleepers", The Wall Street Journal, Nov. 26, 2018, at A-3; see also Voight, H., Infant Sleep Deaths in Focus in Fight over Role of Consumer Safety Agency, Wall Street Journal, Nov. 23, 2018, available at https://www.wsj.com/articles/infant-sleep-deaths-in-focus-in-fight-over-role-of-consumer-safety-agency-1542974400 (last visited June 5, 2019).

6.      Plaintiff, like other Class members, owned and/or purchased the Sleeper unwittingly and unaware of its dangers and suffered damages in that she now must purchase an alternative to the Sleeper and/or lost the benefit of her bargain because she would not have purchased and/or owned the Sleeper had she known it was not safe.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question).

8.      This Court also has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Defendants and is a citizen of a foreign state.

9.      The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Personal jurisdiction is derived from the fact that Defendant Fisher-Price, as well as Defendant Mattel, have regular and systematic contacts with the state of New York and places their products into the stream of commerce.

11.     Venue is proper under 28 U.S.C. § 1391 because Defendant Fisher-Price's headquarters and principal place of business is in this District.

## PARTIES

12.     Plaintiff Jessie Poppe, at all times relevant hereto, has been a citizen of the state of New York. She received a Sleeper in 2012 as a gift and has used it for three of her children. She is now expecting and has sent back her Sleeper pursuant to the Recall. She will now be required to

purchase a new product for the same purposes. She is unable to recover the full price of the Sleeper in the Recall because the purchases occurred over one year ago.

13.    Defendant Fisher-Price is a Delaware Corporation that has its principal place of business at 636 Girard Avenue, East Aurora, New York 14052, and is a subsidiary of Defendant Mattel.

14.    Defendant Mattel is a corporation organized under the laws of the State of Delaware with its principal place of business at 333 Continental Boulevard, El Segundo, California 90245.

15.    At all relevant times, Defendants were and are engaged in the business of operating their business and selling their products in this District.

## FACTUAL ALLEGATIONS

### The Rock 'n Play Product

16.    The Rock 'n Play was designed as a flexible folding frame with a fabric hammock suspended between the legs.  The product has high sides and sits at an incline, causing the infant placed in it to also sit at an incline.

17.    The Rock 'n Play comes with padded inserts that go behind and up to the sides of the infant's head and body.  The shape of the Rock 'n Play's hammock includes an additional angle that pushes up the legs where the infant's torso meets the legs, causing the infant to lay in a semi-seated position.

18.    The Rock 'n Play was designed to rock forward and back and was advertised for both sleep and playtime.

### The Rock 'n Play Was Developed Without Proper Consideration Given to Safety

19.    The Rock 'n Play inclined sleeper product was first introduced to the U.S. market

by Fisher-Price and Mattel in October 2009 and was initially developed by a Fisher-Price industrial designer named Linda Chapman.[4]

20.    Chapman, in a deposition taken in a lawsuit filed by parents of a seven month old infant who turned blue while placed in the Rock 'n Play, testified that the product's original design was based on what she remembered from her interactions with her son's doctor years earlier, when her newborn was suffering from reflux, a common issue that can cause spitting up and bouts of crying: "I was recalling what my pediatrician recommended when my son was little," which was to elevate his head while sleeping.[5]

21.    At the time of the initial development of the Rock 'n Play, Fisher-Price did not have any medical professionals on its staff.  In terms of medical consultants, Fisher-Price retained a medical consultant named Gary Deegear of San Antonio, Texas.  Mr. Deegear had only practiced family medicine for a few years before becoming a consultant. In addition, his court testimony has, on several occasions, been found to be unreliable. In fact, in 2015 after his medical license expired, Mr. Deegear was the subject of a cease and desist order by the Texas Medical Board for practicing medicine without a license and engaging in unsafe medical practices.[6]

22.    In addition, Fisher-Price at the time of initial development and marketing of the product, relied on a letter from the American Academy of Pediatrics by quoting its suggestion for infants who regurgitate consisting of "elevating the head of the crib and diaper changing table to

---

4 Id.

5 Id.

[6] Id.

30 degrees so they never lay flat."[7]

23.    However, by as early as 2010, the data indicated otherwise and the medical advice had been changed to warn that inclining babies was harmful, according to a newsletter by the North American Society for Pediatric Gastroenterology, Hepatology and Nutrition.[8] Currently, the aforementioned section of the American Association of Pediatricians ("AAP") opines that "Placing an infant in a semi-inclined position does not make the condition better" regarding how to best position infants who have reflux-- the infant condition that prompted Linda Chapman to develop the Rock 'n Play.[9]

24.    "What changed? The data," stated Benjamin Gold, a pediatric gastroenterologist and president-elect of the medical society that helped craft the guidelines. Inclined positioning "was no longer recommended for infants." [10] In fact, the AAP recently stated that the Sleepers are "deadly".[11]

25.    By the fall of 2011 the AAP issued an updated policy statement that infants should be placed "back to sleep for every sleep" in the supine position, wholly on his or her

---

[7] See Washington Post article entitled "How Fisher--Price invented a popular day sleeper without safety tests and kept selling it even as babies died" dated May 30, 2019

[8] Id.

[9] See AAP News article dated June 4, 2019 entitled "Hold infants with reflux instead of putting them in seated position" online at
https://www.aappublications.org/news/2019/06/04/reflux060419 (last visited June 4, 2019)

[10] Id.

11 Tiffany Hsu, Fisher-Price Recalls Rock 'n Play Sleeper Linked to Infant Deaths, Apr. 12, 2019 (available at https://www.nytimes.com/2019/04/12/business/fisher-price-rock-n-play-recall.html) (last visited June 4, 2019).

back because "The supine sleeping position does not increase the risk of choking and aspiration in infants, even those with gastro-esophageal reflux." The statement included the admonition that "*Elevating the head of the infant's crib while the infant is supine is not recommended. It is ineffective in reducing astroesophageal reflux; in addition, it might result in the infant sliding to the foot of the crib into a position that might compromise respiration.*"[12]

26.    Thus, based essentially on anecdotal evidence of one of its product developers, Fisher-Price developed and marketed a device no longer recommended and, in fact, found to be unsafe.

27.    Since the release of the Rock 'n Play, approximately 4.7 million units have been sold.[13]  Versions of the Rock 'n Play have retailed for between $40 and $149 at various times.[14]

28.    The Rock 'n Play was, and is, a defective and unsafe product which has caused numerous deaths and injuries throughout the United States because: (1) its shape permits infants to move themselves into a position in which they are unable to breathe against the padded surface of the Rock 'n Play; and (2) the degree of incline of the sleep environment causes infants' heads to pitch at angles which impair breathing and increase the risk of neck and head injuries.

---

[12] See https://pediatrics.aappublications.org/content/128/5/1030 (last visited June 4, 2019).

[13] Fisher-Price Recalls Rock 'n Play Sleepers Due to Reports of Death ("CPSC Recall Statement") (Apr. 12, 2019), https://www.cpsc.gov/Recalls/2019/fisher-price-recalls-rock-n-play-sleepers-due-to-reports-of-deaths (last visited June 4, 2019).

[14] Tiffany Hsu, Fisher-Price Recalls Rock 'n Play Sleeper Linked to Infant Deaths, Apr. 12, 2019 (available at https://www.nytimes.com/2019/04/12/business/fisher-price-rock-n-play-recall.html) (last visited June 4, 2019).

**Defendants' False Representations of Safety**

29.    Fisher-Price advertised the Rock 'n Play as a place for infants to sleep, specifically marketing it as a "Sleeper," and touted it as a miracle product that could give exhausted parents of newborns some much-needed rest.[15]  As noted above at paragraph 2, the very box the Sleeper came in stated: "Baby can sleep at a comfortable incline all night long!" Fisher-Price's public statements include:

    a.  "The inclined seat helps baby sleep all night long."[16]

    b.  "This sleeper helps give your little one the customized soothing motions he or she loves, so you both can get some much-needed shut-eye."[17]

    c.  "Whether they just need a quick snooze or are ready to settle in for the night, the Rock 'n Play sleeper's comfortable, restful environment and dual auto-rocking settings help teeny-tiny ones wind down and relax with a consistent routine."[18]

    d.  "Inclined sleeper designed for all-night sleep"[19]

---

[15] Id.

[16] Wayback Machine Archive of Newborn Rock 'n Play Sleeper Fisher-Price page (Mar. 29, 2017), https://web.archive.org/web/20170329030329/https://fisher-price.mattel.com/shop/en-us/fp/baby-sleepers/newborn-rockn-play-sleeper-bct91 (last visited June 10, 2019).

[17] Google Cache Snapshot of Fisher-Price Auto Rock 'n Play Sleeper Amazon page (Mar. 29, 2019), https://webcache.googleusercontent.com/search?q=cache:GGgqXs-6UAJ:https://www.amazon.com/Fisher-Price-Auto-Rock-Play-Sleeper/dp/B01K7VHP90+&cd=2&hl=en&ct=clnk&gl=us

[18] Id.

[19] Consumer Reports Investigation Article entitled, "Fisher-Price Rock 'n Play Sleeper Should Be Recalled" last updated May 16, 2019 and available online at https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/ (last visited June 4, 2019).

    e.   "Baby can sleep at a comfy incline **all night long**!"[20]

**The Recall**

30.    On April 5, 2019, the CPSC and Fisher-Price issued a joint news release acknowledging that ten infants have died while in the Rock 'n Play Sleeper since 2015, and warned consumers to stop using the Sleepers once the infant reaches three months of age or as soon as the infant exhibits rollover behavior.[21]  The news release stated:

> The Consumer Product Safety Commission (CPSC) and Fisher-Price warn consumers about the Fisher-Price Rock 'n Play due to reports of death when infants roll over in the product.  According to medical literature, infants typically begin rollover behaviors at 3 months.  The CPSC is aware of 10 infant deaths in the Rock 'n Play that have occurred since 2015, after the infants rolled from their back to their stomach or side, while unrestrained.  All 10 infants were 3 months or older.
>
> Because deaths continue to occur, CPSC is recommending consumers stop use of the product by three months of age, or as soon as an infant exhibits rollover capabilities.  CPSC has previously warned consumers to use restraints in infant inclined sleep products.
>
> Fisher-Price warns consumers to stop using the product when infants can roll over, but the reported deaths show that some consumers are still using the product when infants are capable of rolling and without using the three point harness restraint.
>
> CPSC and Fisher-Price remind consumers to create a safe sleep environment for infants, whether using a crib, bassinet, play yard, or inclined sleeper:  Never add blankets, pillows, stuffed toys, or

---

[20] See Dr. Natasha Burgert, Dear Fisher-Price…, https://www.kckidsdoc.com/kc-kids-doc/dear-fisher-price. (emphasis in original) (last visited June 4, 2019).

[21] https://www.cpsc.gov/Newsroom/News-Releases/2019/CPSC-ALERT-CPSC-and-Fisher-Price-Warn-Consumers-About-Fisher-Price-Rock-N-Play-Due-to-Reports-of-Death-When-Infants-Roll-Over-in-the-Product. (last visited June 4, 2019).

other items to the environment and always place infants to sleep on their backs. (Emphasis added).

31. Later that day and shortly after the joint CPSC/Fisher-Price announcement, - Chuck Scothon, General Manager of Fisher-Price, made a statement via press release of Fisher-Price parent Mattel,[22] which stated in relevant part:

> Today, Fisher-Price® and the U.S. Consumer Product Safety Commission (CPSC) jointly issued an alert warning parents and caregivers to discontinue use of the Rock 'n Play Sleeper when infants begin to roll over.
>
> In response to the alert, Fisher-Price released the following additional statement:
>
> A child fatality is an unimaginable tragedy.
>
> Fisher-Price has a long, proud tradition of prioritizing safety as the cornerstone of our mission. Generations of parents have trusted us for almost 90 years to provide safe products for their children. We are there with you from the moment you bring your child home and take our responsibility for product safety very seriously.
>
> Today, the Consumer Product Safety Commission (CPSC) and Fisher-Price have jointly issued an alert warning parents and caregivers to discontinue use of the Rock 'n Play Sleeper when infants begin to roll over. To ensure a safe sleep environment for infants, we remind parents and caregivers to follow all safety warnings included with the product: always use the provided restraints, always place infants on their backs to sleep, and make sure that no pillows, blankets or extra padding are placed in the Rock 'n Play Sleeper. The Rock 'n Play Sleeper meets all applicable safety standards, including those of the international standards organization, known as ASTM International, and is certified by the Juvenile Products Manufacturers Association

---

[22] https://mattel.gcs-web.com/news-releases/news-release-details/media-statement-us-consumer-product-safety-commission-fisher (last visited June 4, 2019).

(JPMA).

Fisher-Price and every one of our employees take the responsibility of being part of your family seriously, and we are committed to earning that trust every day. (Emphasis added).

32.     Incredibly, Fisher-Price was still trying to falsely reassure its customers that its products were safe by emphasizing its tradition of providing safe products and touting that it had met all "applicable standards" even in the face of the Recall and evidence that its sleeper product could be deadly to infants and thus clearly was not safe.

33.     On April 9, 2019, the  president of the AAP called for a recall of all Rock 'n Play Sleepers and "urge[d] parents to stop using the product immediately," calling the product "deadly" and citing its inherent dangers and its failure to meet the AAP's recommendations for safe sleep products:

When parents purchase a product for their baby or child, many assume that if it's being sold in a store, it must be safe to use. Tragically, that is not the case. There is convincing evidence that the Rock 'n Play inclined sleeper puts infants' lives at risk, and CPSC must step up and take immediate action to remove it from stores and prevent further tragedies.[23]

34.     On April 12, 2019, Fisher-Price announced a recall of "All Models of Rock 'n Play Sleeper," admitting that infant fatalities had occurred in the Rock 'n Play.[24] This recall applied to all Rock 'n Play Sleepers – about 4.7 million products.  The CPSC recall page stated

---

[23] AAP Urges U.S. Consumer Product Safety Commission to Recall Fisher-Price Rock 'n Play Sleeper (Apr. 9, 2019), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/AAP-Urges-U-S-Consumer-Product-Safety-Commission-to-Recall-Fisher-Price-Rock-n-Play-Sleeper.aspx (last visited June 4, 2019).

[24] Fisher-Price Recalls Rock 'n Play Sleepers Due to Reports of Death ("CPSC Recall Statement") (Apr. 12, 2019), https://www.cpsc.gov/Recalls/2019/fisher-price-recalls-rock-n-play-sleepers-due-to-reports-of-deaths (last visited June 4, 2019).

that "[c]onsumers should immediately stop using the product" and that "over 30 infant fatalities have occurred in Rock 'n Play Sleepers."

35.     In recalling the Rock 'n Play, Fisher-Price is not offering full refunds to the vast majority of Rock 'n Play purchasers and owners.[25]

## CLASS ACTION ALLEGATIONS

36.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, including subsections (b)(2), (b)(3), and (c)(4), Plaintiff Poppe, individually and on behalf of all others similarly situated, brings this lawsuit on behalf of herself and on behalf of the following proposed Classes:

> **Nationwide Class:** All persons in the United States who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper (the "Class").

> **New York Subclass**:  All persons in New York who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper ("New York Subclass").

37.     Excluded from the Class are Defendants and any entities in which Defendants or their subsidiaries or affiliates have a controlling interest, and Defendants' officers, agents, and employees. Also excluded from the Class are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

38.     Numerosity: The members of each Class are so numerous that joinder of all members of any Class would be impracticable. Plaintiff reasonably believes that Class and Subclass members each total well over 1,000 persons. The names and addresses of Class

---

[25] Fisher-Price Rock 'n Play Sleeper Recall, https://service.mattel.com/us/recall/BJD57_ivr.asp (last visited June 4, 2019).

members are identifiable through documents maintained by Defendants.

39.    Commonality and Predominance: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

a.    Whether Defendants owed a duty of care to Plaintiff and the Class;

b.    Whether Defendants were negligent or grossly negligent in representing the Sleepers were safe;

c.    Whether Defendants represented through advertising, marketing, and labeling that the Sleepers were safe for infants and could be used for general sleeping;

d.    Whether the representations and/or omissions Defendants made through their advertising, marketing, and labeling are false, misleading, or deceptive;

e.    Whether Defendants' representations and/or omissions in advertising, marketing, and labeling are likely to mislead a reasonable consumer;

f.    Whether Defendants had knowledge that their representations and/or omissions in advertising, marketing, and labeling were false, deceptive, or misleading;

g.    Whether Defendants engaged in unlawful, fraudulent, or unfair business practices;

h.    Whether Defendants violated statutes and/or common law as described herein;

i.    Whether Plaintiff and the other Class members are entitled to damages; and

j.    Whether Plaintiff and the other Class members are entitled to declaratory

or injunctive relief.

40.     Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

41.     Typicality: Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff and the other Class members were injured through the substantially uniform misconduct by Defendants. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and of other Class members arise from the same operative facts and are based on the same legal theories.

42.     Adequacy of Representation: Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the other Class members they seek to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff will prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and their counsel.

43.     Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the

court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

44.     Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

45.     Likewise, particular issues under Rule 23(c)(4) of the Federal Rules of Civil Procedure are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to, those set forth in paragraph 39 above, which are incorporated by reference herein.

## First Claim for Relief

### Violation of Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301, et seq.)
### (On Behalf of the Nationwide Class)

46.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

47.     Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

48.     The Rock 'n Play Sleepers that Fisher-Price sells are "consumer products" within the meaning of the MMWA. 15 U.S.C. § 2301(1).

49.     Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act.15 U.S.C. § 2301(4)-(5).

50.     Under the Magnuson-Moss Warranty Act, an "implied warranty" is one that

"arises under State law…in connection with the sale by a supplier of a consumer product." 15 U.S.C. § 2301.

51.    This claim is being brought under Section 2310(d)(a) of the Magnuson-Moss Warranty Act as a state cause of action over which this Court has supplemental jurisdiction which provides a cause of action for consumers who are harmed by the failure of a warrantor to comply with a written or implied warranty.

52.    Defendants made "written warranties" to consumers of the Rock 'n Play under 15 U.S.C. § 2301(6), through Defendants' written affirmations of fact and written promises regarding the Rock 'n Play's level of performance and nature of the product. Specifically, Defendants represented in advertisements, online listings, and on the product packaging itself that the Rock 'n Play was safe for overnight and prolonged infant sleep. These written affirmations formed the basis of the bargain between Defendants and the members of the Class.

53.    Defendants further made "implied warranties" to consumers of the Rock 'n Play under 15 U.S.C. § 2301(7) in that Defendants sold the Rock 'n Play as a "sleeper" that complied with applicable standards, indicating that the product was safe for unsupervised infant sleep.

54.    Defendants breached these warranties because the Rock 'n Play did not meet the affirmations, promises, and assertions made by Defendants regarding the Rock 'n Play.  The Rock 'n Play was, in fact, not safe for use by infants for the ordinary purpose for which it was used or intended.

55.    Although Fisher-Price has recalled the Rock 'n Play, the refunds or gift cards offered to consumers of the Rock 'n Play do not make the consumer whole.

56.    The Rock 'n Play sold for between $40 and $149. Therefore, the amount in controversy exceeds the statutory minimums set forth at 15 U.S.C. § 2310(d)(3) because each member of the Class' claim is equal to or larger than $25.  Further, Defendants have sold

approximately 4.7 million Rock 'n Play Sleepers. Thus, the cumulative amount in controversy excluding interest and costs exceeds $50,000.

57.     As a result of Defendants' violations of the Magnuson Moss Warranty Act, including the written and implied warranties Defendants made to consumers of the Rock 'n Play, Plaintiff and Class members are entitled to recover damages as a result of Defendants' breach of warranties.

58.     Plaintiff and Class members are also entitled to seek costs and expenses, including attorneys' fees, under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(2).

## Second Claim for Relief
### Breach of Implied Warranty of Merchantability
### (On Behalf of the Nationwide Class and the New York Subclass)

59.     Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

60.     The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.  The Defendants marketed, promoted, manufactured, and/or sold the Rock 'n Play Sleepers and placed them into the stream of commerce.  The Defendants knew, or had reason to know, of the ordinary use for which the Sleepers were purchased, and impliedly warranted that the Sleepers were of merchantable quality and fit for such intended us.  Contrary to these representations, the Sleepers were defective because they were not a suitable and safe sleeping environment for prolonged periods or for overnight.

17

61.     At all times, 48 of the 50 United States and the District of Columbia have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability.   The relevant statutes are codified as: Ala. Code §7-2-314; Alaska Stat. §45.02.314; Ariz. Rev. Stat. Ann. §47-2314; Ark. Code Ann. §4-2-314; Cal. Com. Code §2314; Colo. Rev. St §4-2- 314; Conn. Gen. Stat. Ann. §42a-2-314; 6 Del. C. §2-314; D.C. Code §28:2-314; Fla. Stat. Ann. §672.314; Ga. Code Ann. §11-2-314; Haw. Rev. Stat. §490:2-314; Idaho Code §28-2- 314; 810 Ill. Comp. Stat. Ann. 5/2-314; Ind. Code Ann. §26-1-2-314; Iowa Code Ann. §554.2314; Kan. Stat. Ann. §84-2-314; Ky. Rev. Stat. Ann. §355.2-314; La. Civ. Code Ann. art. §2520; 11 Me. Rev. Stat. Ann. §2-314; Md. Code Ann. §2-314; Mass. Gen. Laws Ch. 106 §2-314; Mich. Comp. Laws Ann. §440.2314; Minn. Stat. Ann. §336.2-314; Miss. Code Ann. §75-2-314; Mo. Rev. Stat. §400.2-314; Mont. Code Ann. §30-2-314; Nev. Rev. Stat. U.C.C §104.2314; N.H. Rev. Ann. §382-A:2-314; N.J. Stat. Ann. §12A:2-314; N.M. Stat. Ann. §55-2-314; N.Y. U.C.C. Law §2-314; N.C. Gen. Stat. Ann. §25-2-314; N.D. Stat §41-02-314; Ohio Rev. Code Ann. §1302.27; Okla. Stat. tit. 12A §2-314; Or. Rev. Stat. §72.3140; 13 Pa. Stat. Ann. §2314; RI. Gen. Laws §6A-2-314; S.C. Code Ann. §36-2-314; S.D. Stat. §57A-2-314; Tenn. Code Ann. §47-2-314; Tex. Bus. & Com. Code Ann. §2-314; Utah Code Ann. §70A-2- 314; Va. Code §8.2-314; Vt. Stat. Ann. 9A §2-314; W. Va. Code §46-2-314; Wash. Rev. Code §62A 2-314; Wis. Stat. Ann. §402.314; and Wyo. Stat. §34.1-2-314.

62.     As designers, manufacturers, producers, marketers, and/or sellers of the Rock 'n Play Sleepers, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

18

63.    Defendants designed, manufactured, distributed, marketed, and/or sold the Rock 'n Play Sleepers and represented to Plaintiff and the other Class Members that they manufactured and sold the Sleepers that complied with all applicable state and federal laws and regulations. Further, by selling the Sleepers to Plaintiff and the other Class Members, the Defendants derived a substantial amount of revenue, and continue to do so.

64.    The Rock 'n Play Sleepers are "goods," as defined in the various states' commercial codes governing the implied warranty of merchantability.

65.    As merchants of the Rock 'n Play Sleepers, Defendants knew that purchasers relied upon them to design, manufacture, distribute, and/or sell the Sleepers that would be a safe sleeping environment rather than cause serious injury and death in some cases and was not suitable for infants.

66.    The Defendants designed, distributed, manufactured, and/or sold the Sleepers to consumers, and they knew that such products would be used by the consumers as a safe sleeping environment for their infants.

67.    At the time that the Defendants designed, manufactured, sold, and/or distributed the Sleepers, the Defendants knew the purpose for which the products were intended and impliedly warranted that the products were of merchantable quality; were free of manufacturing defects; were free of design defects; and were safe and fit for their ordinary purpose.

68.    The Defendants breached their implied warranties in connection with the sale of the Sleepers to Plaintiff and other Class Members.  The Rock 'n Play Sleepers are not fit for their ordinary purposes.  They were not free of defects.

69.     As a direct and proximate result of the Defendants' breach of implied warranties, Plaintiff and the other Class Members are entitled to damages available under applicable law, including, but not limited to, the purchase price of the Sleepers.

**Third Claim for Relief**
**Negligent Misrepresentation**
**(On Behalf of the Nationwide Class and the New York Subclass)**

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

71.     Defendants, through their marketing materials and websites and the packaging of the Rock 'n Play, consistently represented to the public throughout the period they were selling the product, that it was a product safe for unsupervised infants to lie and sleep in.

72.     Plaintiff relied on Defendants' misrepresentations in purchasing and using the Rock 'n Play product.

73.     At the time of sale of each Rock 'n Play, Defendants should have known that these representations about the safety of the Rock 'n Play product were false.

74.     Defendants' representations that the Rock 'n Play was safe were material to the purchasing decisions of Plaintiff and the consuming public.

75.     Defendants failed to exercise reasonable care or competence in communicating information regarding the safety of the Rock 'n Play for infants.

76.     These misrepresentations were made uniformly to the consuming public, including the members of the Class. Plaintiff, and members of the Class similarly situated to Plaintiff, relied on Defendants' representations that the Rock 'n Play was safe for unsupervised

infant sleep and use, and would not have purchased and/or owned a Rock 'n Play had Defendants not represented that it was a safe product for infant children.

77.    As a result of Defendants' negligent misrepresentations that the Rock 'n Play was safe for unsupervised infant use and sleep despite ample evidence to the contrary, Plaintiff and the Class have been damaged.

78.    The Class has been harmed by the same negligent misrepresentations, in that its members were induced to purchase and/or own a product unfit for its intended use and therefore without value.

**Fourth Cause of Action**
**Negligent Product Design**
**(On Behalf of the Nationwide Class and the New York Subclass)**

79.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

80.    As manufacturers, distributors and sellers, Defendants have a duty to use reasonable care in designing their product so that it is safe when used in the manner intended, as well as any reasonably foreseeable use.

81.    The Rock 'n Play was sold as a device in which infants could safely lie and sleep.

82.    However, the Rock 'n Play was not safe for that intended use.

83.    Instead, because of the defective design of the Rock 'n Play, including the Rock 'n Play's incline, soft cushion, and seat shape, hundreds of infants have been injured and dozens have died while the Rock 'n Play was used for its intended and marketed purpose.

84.    Defendants failed to exercise reasonable care in ensuring that the design of the Rock 'n Play was free from defects and was safe for infants to lay and sleep in. Defendants' negligent acts include failure to ensure that the design of the Rock 'n Play conformed to AAP standards or to modify or discontinue the product upon receiving reports of injuries to, and deaths of, infants in the product. Defendants failed to ensure that they sought or received appropriate and proper medical advice in the development and marketing of the Rock 'n Play.

85.    The Class has been harmed by the same negligent design, in that its members were induced to purchase and/or own a product unfit for its intended use and therefore without value.

### Fifth Cause of Action
**Fraud**
**(On Behalf of the Nationwide Class and the New York Subclass)**

86.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

87.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

88.    This claim is based on fraudulent representations and omissions concerning the safety of consumers who use the Sleepers.

89.    Defendants failed to disclose that the risks associated with the intended use of the Sleepers, or that the risks were substantially likely to manifest through the customary and intended use of the Sleepers. Defendants also represented the Sleepers as safe for prolonged sleep, when, in fact, they were not.

90.    The false and misleading representations and omissions were made with knowledge of their falsehood. Defendants are nationwide children's product distributors who knew of reports of the Sleepers' dangerous nature.

91.    Nonetheless, Defendants continued to sell their worthless and dangerous Sleepers to unsuspecting consumers.

92.    The false and misleading representations and omissions were made by Defendants, upon which Plaintiff and members of the proposed Class and the New York Subclass reasonably and justifiably relied on and were intended to induce and actually induced Plaintiff and members of the proposed Class and New York Subclass to purchase and/or own the Sleepers.

93.    The fraudulent actions of Defendants caused damage to Plaintiff and members of the proposed Class and Subclass, who are entitled to damages and other legal and equitable relief as a result.

## Sixth Cause of Action
### Unjust Enrichment
**(On Behalf of the Nationwide Class and the New York Subclass)**

94.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

95.    Defendants have knowingly and willingly accepted and enjoyed the benefits of Plaintiff and Class members purchasing or in causing to be purchased and/or owning the Rock 'n Play.

96.     Defendants should not be able to retain the benefit of the funds paid because the members of the Class rendered payment with the expectation that the Rock 'n Play would be as represented and warranted – a safe product for infant sleep and use.

97.     Defendants made deliberate misrepresentations and omissions regarding the actual dangers of the Rock 'n Play, including that the Rock 'n Play was safe for infant sleep. Through those misrepresentations and omissions, the members of the Class purchased the Rock 'n Play to Defendants' profit.

98.     Equity dictates that Defendants' ill-gotten gains be disgorged, and that the members of the Class are entitled to restitution.

**Seventh Cause of Action**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 & 350**
**DECEPTIVE ACTS AND PRACTICES**
**(On Behalf of the New York Subclass)**

99.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

100.     Defendants' practices, acts, policies and course of conduct, as described above, were intended to induce, and did induce, Plaintiff Poppe and the New York Class members to purchase and/or own the Sleepers.

101.     Defendants who marketed and sold the Sleepers knowingly concealed that the Sleepers were unsafe for all night sleeping as well as daily use and made deceptive and untrue statements, as set forth with source citations in § 29 above, as follows:

   a.   "The inclined seat helps baby sleep all night long."

   b.   "This sleeper helps give your little one the customized soothing motions

24

he or she loves, so you both can get some much-needed shut-eye."

    c.   "Whether they just need a quick snooze or are ready to settle in for the night, the Rock 'n Play sleeper's comfortable, restful environment and dual auto-rocking settings help teeny-tiny ones wind down and relax with a consistent routine."

    d.   "Inclined sleeper designed for all-night sleep"; and

    e.   Baby can sleep at a comfy incline all night long**.**

102.   Defendants' practices, acts, policies and course of conduct are actionable in that:

    (a)   Defendants actively and knowingly misrepresented to Plaintiff and the New York Class Members the safety of the Sleepers prior to time of purchase or ownership and during the period of Plaintiff and Subclass members owned the Sleepers;

    (b)   Defendants failed to give adequate warnings and notices regarding the Sleepers' questionable safety despite knowing of infant deaths many years prior to the Recall;

    (c)   Defendants failed to disclose to Plaintiff Poppe and the New York Class the truth about the Sleepers, and/or, in fact, actively concealed the true facts from them; and

    (d)   Defendants caused Plaintiff and the New York Class members to purchase or own the Sleepers, despite the fact that Defendants had prior knowledge

of the infant deaths associated with and caused by use of the Sleepers, by placing them into the stream of commerce.

103.    Each and all of the aforementioned conduct is and was deceptive, false, fraudulent and constitutes an unconscionable commercial practice in that Defendants have, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the lack of safety of the Sleepers.

104.    In making these misrepresentations of fact and/or material omissions to parents while knowing such representations to be false, Defendants have misrepresented and/or knowingly and intentionally concealed material facts and breached their duty not to do so.

105.    Members of the public were deceived by and relied upon Defendants' affirmative misrepresentations and failures to disclose.

106.    Such acts by Defendants are and were deceptive acts or practices which are and/or were, likely to mislead a reasonable consumer purchasing or owning the product.  Said deceptive acts and practices aforementioned are material.  The sale and distribution in New York of the Sleepers was a consumer-oriented act and thereby falls under the New York consumer fraud statute, General Business Law § 349 and 350.

107.    Defendants' wrongful conduct caused Plaintiff and the New York Class to suffer an ascertainable loss by causing them to incur the expense of purchasing new products for their infants to fulfill the function of the product they already owned and thought was safe, but found out wasn't.  In addition to direct monetary losses, Plaintiff and the New York Class have suffered an ascertainable loss by receiving less than what was promised.

108.    A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiff and the New York Class.  Had the true lack of safety of the Sleepers been disclosed, consumers would not have purchased or owned them.

109.    Since Defendants' willful and knowing conduct caused injury to Plaintiff, Plaintiff seeks recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Ford's deceptive conduct; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of the other Class members, respectfully requests that this Court enter an Order:

a.    Certifying the Nationwide Class and the New York Subclass, appointing Plaintiff Poppe as the Class Representative of both, and appointing Plaintiff's Counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

b.    Finding that Defendants' conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

c.    Finding that Defendants' conduct was in violation of the statutes and common law referenced herein;

d.    Enjoining Defendants from engaging in further negligent, deceptive, unfair, and unlawful business practices as alleged herein;

e.    Awarding Plaintiff and the other Class members actual, compensatory, and consequential damages;

f.    Awarding Plaintiff and the other Class members statutory damages and penalties, as allowed by law;

g.      Awarding Plaintiff and the other Class members restitution and disgorgement;

h.      Awarding Plaintiff and the other Class members punitive damages;

i.      Awarding Plaintiff and the other Class members pre-judgment and post-judgment interest;

j.      Awarding Plaintiff and the other Class members reasonable attorneys' fees costs and expenses, and;

k.      Granting such other relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

DATED:      June 28, 2019                    Respectfully submitted,

*/s/ Gary S. Graifman*

_____
Gary S. Graifman, Esq**.**
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone: 845-356-2570
Facsimile:  845-356-4335
ggraifman@kgglaw.com

Melissa R. Emert, Esq.
Howard T. Longman, Esq.
**STULL, STULL & BRODY**
6 East 45th Street-5th floor
New York, NY 10017
Telephone: 212-687-7230
Facsimile:  212-490-2022
Email: memert@ssbny.com
Email: hlongman@ssbny.com

28